UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **JANARD SHAMAR CUNNINGHAM,** | } |
| | } |
| Petitioner, | } |
| | } |
| v. | } Case No.: 2:18-cv-08004-RDP |
| | } 2:16-cr-00035-RDP-HNJ |
| **UNITED STATES OF AMERICA,** | } |
| | } |
| Respondent. | } |

## MEMORANDUM OPINION

This case is before the court on Petitioner's Motion to Vacate, Set Aside, or Correct Sentence. (Case No. 2:18-cv-08004-RDP ("Habeas Docket"), Doc. # 1). After the Government filed a Motion for a More Definite Statement, Petitioner submitted an amended Motion.[1] (*Id.*, Doc. # 5). The Government responded to Petitioner's amended Motion. (*Id.*, Doc. # 6). On December 4, 2018, the court conducted an evidentiary hearing to consider two questions: (1) whether Petitioner directed his counsel of record, James Kendrick, to file an appeal on his behalf; and (2) whether constitutionally adequate counsel would have consulted with his client about filing an appeal. The Motion is now ripe for decision. After careful review of all record evidence and having conducted an evidentiary hearing in which it visually observed the demeanor of Petitioner and Kendrick as they testified, and for the reasons explained below, the court concludes that Petitioner's Motion to Vacate is due to be denied.

### I. Procedural Background

On January 27, 2016, Petitioner was indicted for (1) knowingly possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1) (Count One) and (2) knowingly possessing

---

[1] Although Petitioner titled this document as "Motion to Show Cause Definite Statement," the court will refer to it as Petitioner's amended Motion.

a firearm which he knew or had reasonable cause to believe was stolen in violation of 18 U.S.C. § 922(j) (Count Two). (Case No. 2:16-cr-00035-RDP-HNJ ("Criminal Docket"), Doc. # 1).

Attorney Victor Revill originally represented Petitioner, until Robin P. Robertson and James Tobia Gibson entered an appearance on February 3, 2016. (*Id.*, Docs. # 4, 5). On March 18, 2016, Petitioner executed his first plea agreement with the Government, in which he agreed to plead guilty to Count One of the Indictment. (*Id.*, Doc. # 13 at 1). In exchange, the Government agreed to dismiss Count Two. (*Id.*).

Petitioner appeared before the undersigned on March 22, 2016 for a change of plea hearing. (*Id.*, Doc. # 14 at 1). However, during the plea colloquy, Petitioner informed the court that he believed he was suffering from undiagnosed bipolar disorder, which prevented him from continuing to participate in the consent hearing. (*Id.*). Concerned about Petitioner's competence, the court ordered Petitioner to be examined by a forensic psychologist, Dr. Kimberly Ackerson. (*Id.* at 2). Dr. Ackerson filed her report with the court on April 25, 2016, ultimately concluding that there were "no psychiatric or cognitive issues on the part of Mr. Cunningham precluding him from serving in the role of defendant, including participating in the plea bargain process." (*Id.*, Doc. # 15 at 6). Thereafter, the court conducted a competency hearing and found that Petitioner was fully capable to assist his counsel in his defense, to evaluate his options, and if necessary, to proceed to trial. (*Id.*, Doc. # 24 at 1). Petitioner signaled his desire to go to trial. The court accepted Petitioner's Waiver of Speedy Trial and set a trial date for September 6, 2016. (*Id.*, Docs. # 24, 25).

On August 30, 2016, Petitioner executed his second plea agreement with the Government. That plea agreement was entered pursuant to Federal Rule of Criminal Procedure

11(c)(1)(C) and stipulated a custodial sentence of 120 months.[2] (*Id.*, Doc. # 55). Again, Petitioner agreed to plead guilty to Count One in exchange for the Government's agreement to dismiss Count Two. (*Id.*, Doc. # 55 at 1). The plea agreement contained the following agreed-to factual basis:

> Reports from witnesses at the scene revealed that Detective Brooks had followed Cunningham into the shopping center. After abruptly stopping in front of the DTLR Clothing Store, Cunningham immediately exited his vehicle with a DTLR bag in hand, walked back toward Detective Brooks, and began yelling at him. Brooks ordered the defendant back inside his vehicle. Cunningham, however, refused to comply and began cursing the officer ("Fuck the police!"). Suddenly, the defendant pushed Detective Brooks and punched him in the face. As the two men struggled, Cunningham drew Detective Brooks' service pistol from its holster, grabbed it by the barrel, and used it to strike Detective Brooks numerous times in the head/face until rendering him unconscious. Witnesses, who were standing only feet away, report that Cunningham then took the pistol, returned to his vehicle, and left the scene. During the beating, Detective Brooks sustained serious physical injuries, including a severe concussion, neck injuries, a black eye, and lacerations to his head that required 17 staples to close. He woke up in the hospital five hours later. Brooks did not return to work for more than two months and still experiences some short-term memory loss.
>
> Responding to the scene, BPD officers immediately began searching the area and soon located Cunningham's vehicle. The defendant had left it parked in front of a residence located at 648 Shadywood Drive. The homeowner, Brandon Howard, was standing in the yard near the vehicle when police arrived. While police were in the process of detaining Howard for questioning, Cunningham came from around the side of the house and surrendered. After he was cuffed, Cunningham volunteered that Brooks' gun was "in the car." Cunningham also stated that he was alone at the time of the incident and that nobody else had been involved. Police searched Cunningham's vehicle prior to towing and found Detective Brooks' pistol.
>
> Prior to this incident, Cunningham had been convicted of three felony offenses, including Breaking and Entering a Vehicle; Robbery, First Degree; and Assault, Second Degree.
>
> ATF reports that the firearm functions as designed, and that it was not made in Alabama, thus affecting commerce.

---

[2] The parties also clarified that they understood and agreed that the court would not "order the sentence imposed in this case to run consecutively or concurrently with any sentence imposed in the Defendant's pending state court case." (*Id.* at 5).

(*Id*. at 3-5). Petitioner made several changes to these facts (and initialed each change) including the following: he denied approaching, yelling, cursing or punching Detective Brooks. (*Id*. at 3-4). He confirmed his agreement to the remainder of the factual basis through the following language: "The defendant hereby stipulates that the facts stated above are substantially correct and that the Court can use these facts in calculating the defendant's sentence." (*Id*. at 5).

Additionally, the agreement contained a limited appeal waiver and a waiver of the right to seek post-conviction relief. That waiver provision reads as follows:

> In consideration of the recommended disposition of this case, I, Jenard Shamar Cunningham, hereby waive and give up my right to appeal my conviction and/or sentence in this case, as well as any fines, restitution, and forfeiture orders, the court might impose. Further, I waive and give up the right to challenge my conviction and/or sentence, any fines, restitution, forfeiture orders imposed or the manner in which my conviction and/or sentence, any fines, restitution, and forfeiture orders were determined in any post-conviction proceeding, including, but not limited to, a motion brought under 28 U.S.C. § 2255.
>
> The defendant reserves the right to contest in an appeal or post-conviction proceeding the following:
>
>> (a) Any sentence imposed in excess of the applicable statutory maximum sentence(s);
>> (b) Any sentence imposed in excess of the guideline sentencing range determined by the court at the time sentence is imposed; and
>> (c) Ineffective assistance of counsel.
>
> The defendant acknowledges that before giving up these rights, the defendant discussed the Federal Sentencing Guidelines and their application to the defendant's case with the defendant's attorney, who explained them to the defendant's satisfaction. The defendant further acknowledges and understands that the government retains its right to appeal where authorized by statute.
>
> I, Jenard Shamar Cunningham, hereby place my signature on the line directly below to signify that I fully understand the foregoing paragraphs, and that I am knowingly and voluntarily entering into this waiver.

(*Id*. at 6-7).

Finally, Petitioner confirmed his understanding of the entire agreement by agreeing to the following language: "I have personally and voluntarily placed my initials on every page of this Agreement and have signed the signature line below to indicate that I have read, understand, and approve all of the provisions of this Agreement, both individually and as a total binding agreement." (*Id*. at 13-15).

The court conducted a consent hearing on August 30, 2016 and accepted Petitioner's guilty plea.[3] (*Id*., Doc. # 60). During the hearing, Petitioner acknowledged that he had read each page of the agreement and understood its operation and effect. (*Id*. at 16).

On November 16, 2016, Petitioner filed a letter with the court requesting new counsel and permission to withdraw his guilty plea. (*Id*., Doc. # 58). The court appointed Attorney James

---

[3] Before the court accepted Petitioner's guilty plea, the following exchange took place:

> The Court: If you wish to enter a guilty plea, I'll accept it today. I'm prepared to do that. I'm going to make the findings necessary to do that because I've listened carefully to what you had to say. I've studied your body language and your presentation to me. I think this is a decision you have thought a lot about; you have gone through a lot of time to think about it, and I'm prepared to accept your plea today.
>     Now, if I accept it today, though, what that means is you couldn't go back and change your mind after I accept it and adjudicate you guilty of this offense. Do you understand that?
>
> The Defendant: Yes, Your Honor.
>
> The Court: So while the other charges would be dismissed, you would be adjudged guilty of the charge in count 1. Do you understand that as well?
>
> The Defendant: Yes, Your Honor.
> …
> The Court: All right. Have you heard anything here today that causes you to want to reconsider the decision you made to enter a guilty plea as to count 1?
>
> The Defendant: No, sir.
>
> The Court: Ready to go forward with your plea?
>
> The Defendant: Yes, sir.
>
> The Court: Have you heard and understood everything that has taken place in open court today?
>
> The Defendant: Yes, Your Honor.

(*Id*., Doc. # 60 at 24-26).

Kendrick on December 20, 2016 to replace Robertson and Gibson, and Kendrick represented Petitioner with respect to his sentencing proceedings. (*Id*., Docs. # 61, 62). At the time of sentencing, Kendrick was also representing Petitioner in his corresponding state case. Petitioner currently faces charges in Jefferson County state court. *State of Alabama v. Cunningham*, DC-2015-007165.

Thereafter, Petitioner filed a *pro se* Motion to Withdraw his Guilty Plea. (*Id*., Doc. # 63). The court held a hearing on that Motion. (*Id*., Docs. # 68, 75). With Kendrick as his attorney, Petitioner voluntarily withdrew the Motion and chose to proceed with sentencing.[4] Consistent with the stipulated sentence in his binding plea agreement, Petitioner was sentenced to a prison term of 120 months as to Count One. (*Id*., Docs. # 71, 72 at 12). After the court announced the sentence, the court explained Petitioner's right to appeal:

> Mr. Cunningham, you have the right to appeal the sentence that I just imposed within 14 days if you believe the sentence is in violation of the law. However, as you know, you have entered into a plea agreement in this case which purports to waive some if not all of your rights to appeal your conviction and file a later lawsuit challenging your conviction and sentence in this case. Those waivers are generally enforceable, but if you think the waiver is unenforceable for some reason and wish to file an appeal, you can file the appeal and explain to the court of appeals why the waiver does not include your appeal. Just remember that if you decide to take an appeal, with a few exceptions: Any notice of appeal must be filed within 14 days of judgment being entered in your case.

(*Id*., Doc. # 75 at 15). Petitioner responded that he understood these conditions. (*Id*.). No appeal followed.

---

[4] In assessing whether Petitioner was knowingly and voluntarily deciding to terminate his Motion to Withdraw his Guilty Plea, the court asked the following question: "If you're really wanting to withdraw it, I'm going to let you withdraw it, but I just want to make sure that you thought it through, consulted with your lawyer, looked at each one of these claims, and you really want to withdraw this and go forward with sentencing today. Is that the case, sir?" (*Id*., Doc. # 75 at 4). Petitioner replied, "Yes, sir." (*Id*.).

6

Petitioner filed the instant Motion to Vacate on February 14, 2018.[5] In his petition, he alleges that he received ineffective assistance of counsel when Attorney Kendrick failed to file an appeal despite being asked to do so. (Case No. 2:18-cv-08004-RDP ("Habeas Docket"), Doc. # 1 at 5). In an affidavit attached to his Motion, Petitioner submits that (1) he asked Kendrick to file a direct appeal "raising the issues which were contradicted by the record of conviction;" (2) the plea hearing and colloquy "rendered the plea unknowingly and unintelligently entered which essentially lead to a higher imposition of sentence;" (3) he wrote to Kendrick several times, but Kendrick did not respond to his letters for unknown reasons; and (4) he was unaware that an appeal had not been filed until he contacted the court several months later. (*Id*. at 15). In response to the Government's Motion for a More Definite Statement (*Id*., Doc. # 3), Petitioner filed an amended Motion stating that he verbally requested Kendrick to file a direct appeal during the April 11, 2017 sentencing hearing. (*Id*., Doc. # 5 at 1). He also alleges that he attempted to contact Kendrick via mail while incarcerated at the "detention center waiting to get [designated] to a federal prison." (*Id*.).

In its response to Petitioner's Motion, the Government conceded that this was a case of dueling affidavits requiring an evidentiary hearing. (*Id*., Doc. # 6). The Government attached an affidavit from Kendrick stating that Petitioner never directed him to file an appeal. (*Id*., Doc. # 6-1). While Kendrick admitted that he never consulted with Petitioner about the possibility of appeal, the Government argues that his failure to do so was reasonable because (1) Petitioner expressed no dissatisfaction with Kendrick's services, (2) Petitioner resolved his case with a binding guilty plea that reduced his potential sentence, (3) Petitioner actually received the lowered sentence he bargained for, and (4) the plea agreement that Petitioner signed contained a

---

[5] The court concludes February 14, 2018 is the filing date in compliance with the federal "mailbox rule." *See Taylor v. Williams*, 528 F.3d 847, 849 n.3 (11th Cir. 2008) ("Under the federal 'mailbox rule,' a *pro se* federal habeas petition is deemed to be filed on the date it is delivered to prison authorities for mailing.").

7

limited appeal waiver. Thus, the Government asserts Kendrick had no reason to believe that Petitioner wished to appeal his case. Kendrick also acknowledged that he received two letters from Petitioner in January and February 2018, months after the expiration of the 14-day appeal window. (*Id*. at 7).

The court set this case for an evidentiary hearing on December 4, 2018 in order to decide whether Petitioner requested counsel to file an appeal. (*Id*., Doc. # 7). The court appointed attorney Jeffrey D. Bramer to represent Petitioner at the evidentiary hearing. (*Id*., Docs. # 7, 8 at 2).

## II. Analysis

A federal prisoner may file a motion to vacate his or her sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). It is well settled that "to obtain collateral relief[,] a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982). Here, Petitioner raises only one claim for relief: he received ineffective assistance of counsel due to Kendrick's alleged failure to file a direct appeal after being told to do so. After carefully reviewing the parties' submissions and testimony, the court concludes that Petitioner's Motion is due to be denied.

### A. Standard of Review

The governing standard for ineffective assistance of counsel claims derives from *Strickland v. Washington,* 466 U.S. 668 (1984). In *Strickland*, the Supreme Court established a two-prong test that must be met for a petitioner to succeed. *Id.* at 687. First, a petitioner must

show that counsel's performance was deficient, *i.e.*, the performance was outside the range of professionally competent assistance. *Id.* The proper measure of an attorney's performance is "reasonableness under prevailing professional norms." *Id.* at 688. "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. [The court asks] only whether some reasonable lawyer . . . could have acted, in the circumstances, as defense counsel acted . . . ." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992); *see also Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) (*en banc*) (stating that "perfection is not the standard of effective assistance"). Second, a petitioner must also establish prejudice. That is, he must show there is a reasonable probability that, absent counsel's errors, the outcome of the proceeding would have been different. *Id*. at 687; *Chandler v. United States*, 218 F.3d 1305, 1312-13 (11th Cir. 2000) (*en banc*).

The Supreme Court in *Roe v. Flores-Ortega* held that the *Strickland* test applies with equal force in determining whether counsel was ineffective in failing to file an appeal. 528 U.S. 470, 476 (2000). Consistent with longstanding precedent, the court has no trouble finding that a lawyer who has ignored specific instructions from his client to file a notice of appeal has acted unreasonably. *Id*.; *see also Rodriquez v. United States*, 395 U.S. 327 (1969). The analysis is more complicated where, like in this case, it is not clear that a petitioner instructed his attorney to act. The questions then become (1) whether counsel consulted with his client about an appeal, and (2) if not, whether counsel's failure to do so constitutes deficient performance. *Flores-Ortega*, 528 U.S. at 478.

As to the first prong of the *Strickland* test (dealing with the reasonableness of the attorney's conduct), "counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to

appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id.* at 480. In evaluating the import of the information available to the attorney, the court considers the following:

> Although not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights.

*Id.*

With respect to *Strickland*'s "prejudice" prong, a petitioner must demonstrate either that his counsel failed to file an appeal after being requested to do so or that "there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Id.* at 484. In establishing prejudice, a petitioner is not required to show that there were viable grounds for an appeal or that the substance of his appeal "would fit one of the exceptions contained in his appeal waiver." *Gomez-Diaz v. United States*, 433 F.3d 788, 793 (11th Cir. 2005).

### B. Petitioner's Motion to Vacate is Due to be Dismissed

On December 4, 2018, the court held an evidentiary hearing to evaluate the credibility of Petitioner's claim that he instructed Kendrick to file an appeal. Petitioner was represented by court appointed counsel, Jeffrey Bramer.[6] The court heard testimony from Petitioner, Petitioner's mother, and Kendrick. The court begins its analysis by comparing Petitioner's and Kendrick's versions of the facts. The court then summarizes its findings of fact in light of the various inconsistencies between Petitioner's prior sworn testimony and evidentiary hearing testimony.

---

[6] The court commends Mr. Bramer for his diligence, acumen, and hard work in representing Petitioner.

Finally, the court applies *Strickland* and *Flores-Ortega* to the circumstances of Petitioner's case and concludes that Petitioner's Motion is due to be dismissed.

### i. Evidentiary Hearing Testimony

Petitioner testified during the hearing that he discussed the prospect of appeal with Kendrick at least three times. (1) He stated that he first instructed Kendrick to appeal his case immediately after sentencing in the Marshal's office on April 11, 2017. No one else was present for this conversation. (2) Later in April, he claims that he and Kendrick discussed his appeal options again at the Jefferson County jail in advance of a hearing in his state case. (3) Petitioner alleges the third and final discussion occurred at the Shelby County jail, although the hearing record does not indicate when he contends this last discussion took place.

Petitioner testified that he attempted to call Kendrick multiple times from prison, but received no response. Following these unsuccessful attempts to contact Kendrick, Petitioner asserts he finally wrote to the Clerk of Court regarding the status of his appeal and discovered no appeal had been filed. Petitioner's mother, Angela Cunningham, testified that she also called Kendrick several times to discuss her son's state and federal cases. While Kendrick's call records confirm that he spoke with Ms. Cunningham, at the hearing she could not recall the substance of those conversations, and in particular, whether they related to an appeal. She acknowledged that the majority of their conversations revolved around Petitioner's state case. Kendrick denies he discussed with her an appeal of Petitioner's federal conviction or sentence.

Kendrick has been a licensed attorney for over thirty years practicing in both state and federal courts. Criminal casework accounts for ninety percent of his business. On December 20, 2016, the court appointed Kendrick to represent Petitioner at the sentencing stage of proceedings. (Case No. 2:16-cr-00035-RDP-HNJ ("Criminal Docket"), Doc. # 62). At this point, Petitioner

had pled guilty and filed a *pro se* motion to withdraw that guilty plea. (*Id*., Doc. # 63). And, he had already cycled through three different lawyers. Consistent with Petitioner's wishes, Kendrick appeared in court with him on April 11, 2017 to withdraw the *pro se* Motion and proceed to sentencing.

At the § 2255 evidentiary hearing, Kendrick testified that he discussed the plea agreement with Petitioner who understood he would receive a 120-month sentence pursuant to that agreement. Kendrick also explained that Petitioner had made several initialed changes to the factual basis of the plea agreement with the help of his prior counsel, Ms. Robertson. These changes had already been submitted to the court during Petitioner's August 30, 2016 consent hearing, and after these changes were made, Petitioner had openly acknowledged his agreement to the accuracy of the factual basis in its entirety. Kendrick did not recall Petitioner informing him (Kendrick) of any further objections he had to the factual basis in the plea agreement and the presentence report—either before, during, or immediately after sentencing.

After sentencing, Kendrick met with Petitioner's family outside the courtroom and they discussed his state case. According to Kendrick, Petitioner's family did not ask whether an appeal would be filed. He partially confirmed Petitioner's testimony that they met in the Marshal's office after sentencing; however, Kendrick testified that they only discussed Petitioner's state case, and Petitioner did not instruct him to file an appeal. Furthermore, Kendrick stated that he never met in-person with Petitioner at the Jefferson County or Shelby County jails in the weeks immediately following sentencing. Although he spoke with Petitioner's mother about Petitioner's state case during the week of sentencing, Kendrick allegedly did not receive any correspondence from Petitioner or Petitioner's family instructing him to file an appeal. Over the course of the next few months, he spoke to Petitioner's mother several times

12

over the phone about the status of Petitioner's state case. Finally, well after the fact, he received two letters from Petitioner dated in January and February 2018 in which Petitioner expressed his amazement that no appeal had been filed.

When asked why he never discussed the possibility of appeal with Petitioner, Kendrick responded that he was not aware of anyone that would want to pursue an appeal in Petitioner's circumstances. Petitioner never expressed any dissatisfaction about Kendrick's performance, and Kendrick helped Petitioner resolve this troublesome case with a highly favorable sentence.

### ii. Findings of Fact

After reviewing the parties' submissions and testimony, the court credits Kendrick's testimony that Petitioner did not request or instruct him to file an appeal. The court rejects and expressly finds disingenuous Petitioner's testimony to the contrary. The court also concludes that a reasonable attorney in Kendrick's position would not have found it necessary to discuss a potential appeal with Petitioner. The court makes the following additional findings of fact.

1. After Petitioner had filed a *pro se* Motion to Withdraw his August 30, 2016 guilty plea, the court appointed Kendrick to represent Petitioner on December 20, 2016. (Case No. 2:16-cr-00035-RDP-HNJ ("Criminal Docket"), Doc. # 62).

2. With Kendrick as his counsel, Petitioner changed his mind, withdrew his motion, and proceeded directly to sentencing on April 11, 2016. (*Id*., Doc. # 75). Petitioner consulted with Kendrick and Petitioner knowingly and voluntarily withdrew his motion. (*Id*. at 4).

3. Kendrick discussed the presentence report with Petitioner and thereafter changes were made to the plea agreement and those changes were approved by Petitioner. But, no objections were filed prior to sentencing. (*Id*. at 5). The court asked Petitioner whether he had any questions or final comments before the sentence was pronounced, but Petitioner only

13

clarified that the time he had already served would be counted toward his binding sentence. (*Id*. at 8-9). Accordingly, Petitioner was sentenced to 120-months in prison on Count One. (*Id*. at 12). A highly relevant factor in the court's analysis is that the conviction and sentence follow a guilty plea because a guilty plea "reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings." *Flores-Ortega*, 528 U.S. at 486. Of course, even when a defendant pleads guilty, the court must consider whether he received the sentence he bargained for in the plea and whether the plea reserved or waived some or all appeal rights. *Id*. But, particularly given that the parties agreed to a binding plea under Rule 11(c)(1)(C), this is an important factor in the court's analysis.

4. The court explicitly advised Petitioner that any appeal would have to be filed within 14 days of the entry of judgment. (*Id*. at 15). Petitioner responded that he understood. (*Id*.).

5. Once Petitioner's sentence was announced, he was taken down to the Marshal's office while Kendrick spoke with Petitioner's family members about the status of his state case. No appeal was discussed at this time—either by Kendrick and Petitioner or by Kendrick and Petitioner's family.

6. Kendrick then visited Petitioner in the Marshal's office where they discussed his state case. Petitioner did not instruct Kendrick to file an appeal of his federal conviction or sentence. The court makes this finding in light of the following facts: (a) Petitioner knowingly and voluntarily decided to continue with his guilty plea and proceed to sentencing moments before this conversation took place; (b) Petitioner fully understood his plea was binding on the court, and that the sentence agreed to by the Government and Petitioner was lower than the sentence the Government would obviously have sought after any trial resulting in a conviction;

14

(c) the record indicates that neither Petitioner nor his family expressed dissatisfaction with Kendrick's services at this time; (d) Petitioner was facing an indictment that charged him with a highly publicized crime and there was overwhelming evidence of his guilt; and (e) Petitioner cannot point to any ruling which was decided adverse to him that a reasonable person in his position would have sought to appeal.

7. In the weeks following the sentencing, Kendrick focused on Petitioner's state case. Although he spoke with Petitioner's mother about the state proceedings, he did not have an occasion to meet Petitioner in-person at the Jefferson County or Shelby County jails. In fact, the court finds, consistent with Kendrick's testimony, that no such meeting ever occurred. Thus, Petitioner did not instruct Kendrick to file an appeal at either of those locations.

8. By his own admission, Kendrick never discussed the possibility of appeal with Petitioner. But, he did not think it was necessary.

The court credits Kendrick's testimony on these issues given Petitioner's utter lack of credibility at the evidentiary hearing. For example (and this is but one example),[7] early in the hearing when the court questioned Petitioner about his rationale for wanting to file an appeal, Petitioner responded that during sentencing, he instructed Kendrick to object to certain facts contained in the plea agreement and the presentence report because he was concerned those admissions would have some negative effect on his currently pending state case. Specifically, he denied punching Detective Brooks in the face; but, as the court pointed out, that denial was already noted in his plea agreement, and thus Petitioner did not admit to that fact as part of his plea. (Case No. 2:16-cr-00035-RDP-HNJ ("Criminal Docket"), Doc. # 55 at 3-4).

---

[7] The court has neither the time nor inclination to catalog all of the discrepancies and inconsistencies in Petitioner's testimony. They were legion.

In addition, Petitioner also insisted he had a justification defense for possessing Detective Brooks' firearm. However, while explaining his justification theory, Petitioner "recalled" facts not included in his plea agreement that were squarely inconsistent with that factual basis he agreed to—facts that Petitioner had (on multiple occasions) sworn to be the true and complete version of the events.[8] Notably, Petitioner stated that he did not assault Detective Brooks at all, but rather two strangers from the crowd beat Brooks until he lost consciousness. And, he claimed the reason that Petitioner kept Detective Brooks' gun was (depending which version of facts Petitioner was "selling" the court at the particular time) either to prevent Brooks from shooting these strangers or to protect himself from attacks from other police officers because he thought his life was in danger in light of his involvement in an altercation with Brooks.[9] Petitioner had already made sworn, initialed changes to the factual basis of the plea agreement, yet neglected to

---

[8] In his plea agreement, Petitioner certified that the factual basis was a complete and accurate version of the events: "The defendant hereby stipulates that the facts stated above are substantially correct and that the Court can use these facts in calculating the defendant's sentence." (*Id.*, Doc. # 55 at 5). Petitioner confirmed the same during his August 30, 2016 change of plea hearing:

> The Court: What I want to make sure you understand is that by signing the agreement and approving these changes to the agreement and entering your plea pursuant to this agreement today, you are agreeing that these facts are true and correct to the best of your knowledge, you are admitting that the things it says you did you actually did, and you are waiving your right to have a jury determine these facts to be true beyond a reasonable doubt. Do you understand all those things?
>
> The Defendant: Yes, Your Honor.
>
> The Court: And that includes the denials you have made with respect to approaching and yelling at Detective Brooks, cursing at Detective Brooks, or punching Detective Brooks. Those are included in there. Do you understand that?
>
> The Defendant: Yes, Your Honor.

(*Id.*, Doc. # 60 at 17)

[9] But even this assertion was inconsistent with other portions of Petitioner's testimony. At another point in his description of the events leading up to the attack, Petitioner claimed he was not aware that Brooks was a police officer because he was in plain clothes and did not announce himself as law enforcement. The court finds that assertion incredulous.

include these facts. Consequently, Petitioner's blatantly inconsistent recollection of the facts caused the court (from a very early point in the hearing) to doubt his credibility.

Equally detrimental to Petitioner's credibility was his "claim" that he lied to the court several times during the August 30, 2016 change of plea hearing. For example, despite his sworn statements at the consent hearing affirming his understanding of the plea agreement, Petitioner testified at the evidentiary hearing that he does not know what a binding plea agreement is because he only "somewhat" understands the English language. Yet, during his change of plea hearing, he told the court that he had "some college" education and could fully understand the English language. (*Id.*, Doc. # 60 at 5, 6). Moreover, the court carefully explained to Petitioner the meaning of a binding plea agreement before it accepted his guilty plea:

> The Court: Let me explain how I handle the binding nature. I'm going to conditionally accept your guilty plea. I, quite frankly, don't expect any issue with respect to your plea, but it has always been my practice that when we get to sentencing and if for any reason I have a concern about accepting your guilty plea, then I would give you the option of withdrawing your plea. Do you understand how that works?
>
> The Defendant: Yes, sir.
>
> The Court: So it's binding in the sense that I'm not going to sentence you to anything other than what you have agreed to and what the government has agreed to…

(*Id.* at 19-20). The court also asked Petitioner if he had "any questions concerning the meaning of the agreement or its operation or effect" on him that his lawyer did not answer to his satisfaction. (*Id.*, at 16). He replied, "No, sir." (*Id.*). However, when asked about this statement at the evidentiary hearing, Petitioner admitted to the following: (1) he lied to the court several times while under oath; (2) he did not understand the plea agreement even though he told the court he did understand it; (3) he knew at the time of the plea hearing that he wanted to fire his attorney, Robin Robertson, but lied to the court that he was satisfied with her representation; and (4) he

17

just wanted to get the plea hearing over with. These admissions demonstrated Petitioner's consistent lack of regard for his sworn duty to give truthful testimony.

With respect to his allegation that he instructed Kendrick to file an appeal, Petitioner's testimony at the evidentiary hearing revealed yet another discrepancy in his prior communications with the court. His amended Motion stated that he gave this instruction *during* his April 11, 2017 sentencing hearing. (Case No. 2:18-cv-08004-RDP ("Habeas Docket"), Doc. # 5 at 1). But, as Petitioner has admitted, the statement contained in the amended Motion was an incorrect statement that he signed under penalty of perjury. Instead, Petitioner testified that he instructed Kendrick to file an appeal in the Marshal's office *after* sentencing and again at the Jefferson County jail. Petitioner further admitted that he did not write the Amended Motion himself, and he "pled the Fifth" when asked who wrote it for him.

Due to these and numerous other inconsistencies, the court credits Kendrick's testimony that Petitioner did not instruct him to file an appeal.

### iii. Application of *Strickland* and *Flores-Ortega*

The court credits Kendrick's testimony that Petitioner did not instruct him to file an appeal, but that finding does not end the court's inquiry. The next question is whether Kendrick had a duty to consult with Petitioner regarding an appeal. Although Kendrick readily admits that he did not consult with Petitioner, this would only violate his duty as Petitioner's counsel if either (1) a rational defendant would want to appeal or (2) Petitioner "reasonably demonstrated to counsel that he was interested in appealing." *Flores-Ortega*, 528 U.S. at 480. Petitioner has not credibly established that the circumstances of this case fall into either category.

First, Petitioner has not demonstrated that a rational defendant in his position would have desired to file an appeal. As discussed previously, the court considers such factors including

whether the conviction and sentence follows a guilty plea, whether the defendant received the sentence he bargained for in the plea agreement, and whether the plea reserves or waives some or all appeal rights. *Flores-Ortega*, 528 U.S. at 486. Here, each of these factors works against Petitioner.

With the aid of his counsel, Petitioner entered into a favorable plea agreement in which the Government agreed not to prosecute him in this problematic case on Count Two for knowingly possessing a stolen firearm. (Case No. 2:16-cr-00035-RDP-HNJ ("Criminal Docket"), Doc. # 55). Pursuant to the agreement, Petitioner was sentenced to 120-months as to Count 1. (*Id*.). Thus, Petitioner received the reduced sentence he bargained for. Moreover, although Rule 11(c)(1)(C) is rarely used in this district, the Government and Petitioner agreement to a binding sentence that the court could not adjust. Petitioner also understood that the agreement contained a limited appeal waiver. (*Id*.). This was the second time Petitioner had negotiated a plea agreement with the Government. He was familiar with the process and the benefit he would receive in doing so. It is also noteworthy that immediately before he was sentenced, Petitioner knowingly and voluntarily withdrew his Motion to Withdraw his Guilty Plea. (*Id*., Doc. # 75). In the court's general and practical experience, a petitioner does not agree to a binding sentence in a plea hearing, leave the courtroom, and then immediately pursue an appeal. Consequently, Kendrick had no duty to consult with Petitioner about an appeal because Petitioner cannot show that a rational defendant in his shoes would have wanted to appeal.

Furthermore, and consistent with the court's factual findings, Petitioner did not reasonably demonstrate he had (or that a reasonable defendant would have had) an interest in appealing his criminal conviction or sentence. Again, in light of his uncredible testimony at the evidentiary hearing, including the discrepancies between Petitioner's prior sworn testimony and

19

his testimony at the evidentiary hearing, the court credits Kendrick's testimony that Petitioner did not express any interest in appeal until he wrote Kendrick from prison in January and February 2018. During the weeks immediately following sentencing, he and his family had not voiced any dissatisfaction with Kendrick's services, and questions posed to him revolved around Petitioner's actively pending state case. At this case's conclusion, there was nothing that triggered any responsibility for Kendrick to consult with Petitioner about an appeal because (1) Petitioner gave no indication that he wanted to appeal and (2) there was no objective reason to believe that someone in Petitioner's position would have wished to take one.

In summary, the court finds that Petitioner did not instruct Kendrick to appeal and Kendrick had no further duty to consult with Petitioner regarding an appeal. Therefore, Kendrick did not render ineffective assistance, and Petitioner's claim is due to be denied.

### III. Conclusion

After careful consideration, and for the reasons explained above, Petitioner's Motion to Vacate (*Id.*, Doc. # 1) is due to be denied. A separate Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this January 7, 2019.

*/s/ R. David Proctor*
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE